Christopher A. Seeger, Esq.
David R. Buchanan, Esq.
Christopher L. Ayers, Esq.
Justin M. Smigelsky, Esq.
**SEEGER WEISS LLP**
55 Challenger Road, 6th Floor
Ridgefield Park, New Jersey 07660
Telephone: (973) 639-9100

Shauna B. Itri, Esq.
**SEEGER WEISS LLP**
1515 Market Street, Suite 1380
Philadelphia, PA 19102
Telephone: (215) 564-2300

Attorneys for Plaintiffs and the Proposed Classes

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JANNAT DENISE BRITO and JOSE ROSARIO JIMENEZ, individually and on behalf of all others similarly situated,<br><br>                Plaintiffs,<br><br>v.<br><br>SAMSUNG ELECTRONICS AMERICA, INC., and SAMSUNG ELECTRONICS CO., LTD.,<br><br>                Defendants. | Civil Action No. 2:22-cv-01348-JMV-AME<br><br><br><br>**FIRST AMENDED COMPLAINT and DEMAND FOR JURY TRIAL** |

# Table of Contents

I. INTRODUCTION ............................................................................................................. 3

II. PARTIES ....................................................................................................................... 6

III. JURISDICTION AND VENUE ..................................................................................... 7

IV. FACTUAL ALLEGATIONS COMMON TO ALL COUNTS ........................................ 8

   A. Samsung Mobile Devices ........................................................................................ 8

   B. Samsung's Performance Representations ................................................................ 10

   C. Samsung's GOS App Throttling ............................................................................. 16

   D. Samsung's Arbitration Agreement ......................................................................... 19

V. CLASS ACTION ALLEGATIONS ............................................................................. 21

VI. CAUSES OF ACTION ................................................................................................ 25

   A. Claims Brought on Behalf of the Nationwide Class ............................................... 25

      COUNT I – FRAUD ................................................................................................ 25

      COUNT II – UNJUST ENRICHMENT / QUASI-CONTRACT ........................... 30

      COUNT III – FRAUD BY CONCEALMENT ....................................................... 31

      COUNT IV – BREACH OF EXPRESS WARRANTY .......................................... 34

      COUNT V – BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY ........... 35

   B. Claims Brought on Behalf of the New York Subclass ............................................ 37

      COUNT VI – VIOLATIONS OF THE NEW YORK GENERAL BUSINESS LAW § 349 ... 37

   DEMAND FOR JURY TRIAL .................................................................................... 42

Jannat Denise Brito and Jose Rosario Jimenez ("Plaintiffs") bring this class action suit individually and on behalf of all others similarly situated against Defendants Samsung Electronics America, Inc., and Samsung Electronics Co., Ltd. (collectively, "Defendants" or "Samsung") for the design, manufacturing, marketing, and sale of various smartphone models containing the Game Optimizing Service ("GOS") app, including, but not limited to, models and versions of the S10, S20, S21, and S22, and versions designated as "FE," "Ultra," "Plus," or the like (collectively, "Devices"). Plaintiffs make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to the allegations specifically pertaining to themselves which are based on personal knowledge.

## I.   INTRODUCTION

1.      This is a class action suit against Defendants for the design, manufacturing, marketing, and sale of Devices which engage in "benchmark cheating." Plaintiffs allege that the Samsung Devices at issue contain a mobile application ("app")[1] called Game Optimizing Service ("GOS") that artificially and selectively limits – or "throttles" – access to the Devices' processing power and other resources, purportedly with the intention of preventing overheating to and extending battery life of the Devices. Specifically, Samsung has programmed these Devices to run at faster than normal speeds (or higher speeds than apps operating in the real world) when they detect certain "benchmarking" apps; *i.e.*, performance-measuring tools used by reviewers and consumers to test and compare the speed and performance of smartphones and tablets.

2.      Samsung's deception is quite simple: in an effort to remain competitive, Samsung promises to deliver *both* better, faster performance and better, longer battery life. However,

---

[1] An "app" is a computer program or software application designed to run on a mobile device such as a phone, tablet, or watch.

knowing it cannot deliver as promised, Samsung intentionally programmed its Devices to cheat benchmark apps, and to create false perceptions regarding the speed, performance, and battery life of these Devices. Samsung's throttling manipulation was intended to address a defect in the design of its Devices: the fact that the Devices' batteries lacked the capacity and power delivery to keep up with the demands placed upon them by Samsung's hardware and software (hereafter, "the Defect").

3.      Samsung knew that publications and review sites regularly use benchmarking apps to review and evaluate new devices and to compare those devices to competing or predecessor devices.

4.      Samsung also knew that if it artificially boosted the performance of its devices when running benchmarking apps, reviewers and the public would falsely believe that the Devices were similarly as fast in real-world situations.  In reality, the processors in the Devices run at a lower speed when the devices are performing real-world tasks instead of running benchmarking apps – otherwise, the Device's battery life would be diminished and/or the device might overheat.

5.      Samsung intentionally cheated on benchmarking apps to create a false perception regarding the speed and performance of the Devices, to thereby increase the demand for its new devices, and to support a high price-point for these devices—all to the detriment of the buying public.

6.       Samsung engaged in secretly "throttling" the performance of apps on its smartphones. That is, Samsung has programmed the Devices to limit access to their fastest processing cores for numerous popular applications, causing slowdown in typical workloads such as web browsing and gaming.  In turn, Samsung was able to advertise its Devices as achieving significant speeds and high-level performance, while maintaining ample battery life. However, the

advertised benchmark results are useless for the user's experience, as applications on Samsung's smartphones are secretly throttled by Defendant.

7.      Consequently, based on Samsung's representations, consumers have been led to believe that the Devices are much faster and more powerful than they perform. This means that, in light of the Defect, consumers are not getting the full advertised performance of their phones, and are caused to purchase phones they otherwise would not have purchased and/or are paying a significant price premium for characteristics – *i.e.*, speed, power, and performance – that they are not receiving.

8.      Samsung is well aware that publications and review sites regularly use benchmarking apps to review and evaluate new devices and to compare competing or predecessor devices, and has a history of seeking to circumvent benchmarking tests. Indeed, in February of 2014, a class action lawsuit was initiated against Samsung Electronics America, Inc. (as well as since-absorbed affiliate Samsung Telecommunications America, LLC) alleging a form of consumer deception inverse to the instant allegations – that Samsung programmed its Devices to artificially increase speed when they detect certain benchmarking apps. Furthermore, the lawsuit alleged that Samsung intentionally cheated on benchmarking apps to create a false perception regarding the speed and performance of its Devices, to thereby increase the demand and support a high price-point for its Devices.[2] In or about September of 2020, a settlement was reached to resolve the claims that Samsung engaged in misleading smartphone speed advertisements.

9.      Although Samsung has changed its method, its efforts to falsely portray the attributes of its Devices by way of benchmark manipulation have continued.

_____

[2] *Norcia v. Samsung Telecommunications America, LLC and Samsung Electronics America, Inc.*, United States District Court for the Northern District of California, Case No. 3:14-cv-582.

10.     Samsung's actions and omissions violate well-established legal and statutory duties it owed to Plaintiffs and all other similarly situated United States consumers.

11.     Plaintiffs exercised their right to opt out of the Arbitration Agreement contained in Samsung's Terms and Conditions. Plaintiffs bring this class action on behalf of themselves and all similarly situated consumers who opted out of or are otherwise not subject to the purported Arbitration Agreement contained in Samsung's Terms and Conditions, for actual and statutory damages, as well as punitive damages and equitable relief to fully redress the vast harm Samsung's wrongful acts have unleashed on United States consumers.

## II.     PARTIES

### A.  Plaintiffs

12.     Plaintiffs Jannat Denise Brito and her spouse, Jose Rosario Jimenez, are domiciled New York citizens, residing in Brooklyn, New York.

13.     On or about May 6, 2022, Jose Rosario Jimenez purchased a new Samsung Galaxy S22 for Jannat Denise Brito.

14.     Jose Rosario Jimenez reviewed and relied upon marketing materials and advertisements concerning the Samsung Galaxy S22 prior to purchasing it. None of the representations received by Mr. Jimenez contained any disclosure relating to the GOS app.

15.     On or about May 13, 2022, Jannat Denise Brito emailed optout@sea.samsung.com, the email address designated by Samsung Electronics America, Inc. to opt out of the purported Arbitration Agreement contained within its Terms and Conditions, and provided "the applicable information" which, per the Agreement, included her name and address, date of purchase, product model name and code, and the international mobile equipment identity (IMEI) number.

Accordingly, Ms. Brito successfully opted out of the purported Arbitration Agreement contained within Samsung Electronics America, Inc.'s Terms and Conditions.

**B. Defendant Samsung Electronics America, Inc.**

16.     Defendant Samsung Electronics America, Inc., the designer, manufacturer, and vendor of Samsung smartphones, is a corporation existing under the law of the State of New York, headquartered at 85 Challenger Road, Ridgefield Park, New Jersey 07660, and a subsidiary of Samsung Electronics Co., Ltd. Defendant Samsung Electronics America, Inc. regularly conducts business in this District and throughout the United States.

**C. Defendant Samsung Electronics Co., Ltd.**

17.     Defendant Samsung Electronics Co., Ltd., is a corporation existing under the laws of the Republic of Korea, headquartered at 129 Samsung-ro, Yeongtong-gu Suwon, Gyeonggi, 16677, Republic of Korea, and is the parent company to Samsung Electronics America, Inc. Defendant Samsung Electronics Co., Ltd., regularly conducts business in this District and throughout the United States.

18.     Defendants Samsung Electronics America, Inc., and Samsung Electronics Co., Ltd., are collectively referred to herein as "Defendant" or "Samsung."

### III.     JURISDICTION AND VENUE

19.     This Court has personal and subject matter jurisdiction over all causes of action asserted herein.

20.     The Court has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because at least one Class Member is of diverse citizenship from Defendant, there are more than 100 members of the class ("Class Members"), and the aggregate amount in controversy exceeds $5,000,000, exclusive of interests and costs.

21.     This Court has personal jurisdiction over Samsung by virtue of Samsung being headquartered in this District, Samsung transacting and doing business in this District, and because Samsung intentionally availed itself of the laws of New Jersey by transacting a substantial amount of business throughout the State and this District. Defendant has engaged in statutory violations and common law tortious conduct in New Jersey and in this District.

22.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District. Samsung is headquartered in this District and transacts affairs in this District.

### IV.     FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

#### A.  Samsung Mobile Devices

23.     Samsung Telecommunications and Samsung Electronics are part of the multinational Samsung Group conglomerate, which is headquartered in Seoul, South Korea.  The Samsung Group has subsidiaries across widely varied industries, including shipbuilding, construction, insurance and aerospace as well as consumer electronics. Samsung Electronics Co. Ltd., the parent of Defendant Samsung Electronics, consists of the following business divisions that operate independently: the Information Technology & Mobile Communications Division, which manufactures and sells smart mobile devices, network systems, and computers and the Device Solutions Division, which predominantly manufactures and sells products such as DRAM and NAND products, mobile application processors, and camera sensor chips.

24.     According to statistics retrieved from Statista.com[3], the smartphone market in the United States is one of the world's largest, with more than 290 million smartphone users. In line with the overall growth of the smartphone market worldwide, the smartphone penetration rate in

---

[3] https://www.statista.com/topics/2711/us-smartphone-market/#dossierKeyfigures

the United States has continuously risen over the past several years, reaching 85 percent in February 2021. Apple and Samsung are the market leaders in the United States smartphone market and, as of 2021, Apple was the smartphone sales share leader. Samsung smartphones, which operate on the Google Android operating system, are second with 27.6% of U.S. smartphone subscribers.

25.     The following table depicts Samsung Devices impacted by GOS benchmark manipulation, along with respective announcement and release dates, and approximate retail price (prices fluctuate based on various circumstances, such as where the consumer purchases the device directly from Samsung or from a third party, where sold by a wireless services provider in conjunction with a service contract, etc.):

| Samsung Device | Date Announced | U.S. Release Date | Approx. Retail Price |
|---|---|---|---|
| Galaxy S10 | February 20, 2019 | March 8, 2019 | $799.00 |
| Galaxy S10+ | February 20, 2019 | March 8, 2019 | $899.00 |
| Galaxy S10e | February 20, 2019 | March 8, 2019 | $649.00 |
| Galaxy S20 | February 11, 2020 | March 6, 2020 | $999.00 |
| Galaxy S20+ | February 11, 2020 | March 6, 2020 | $1,199.99 |
| Galaxy S20 Ultra | February 11, 2020 | March 6, 2020 | $1,399.99 |
| Galaxy S21 | January 14, 2021 | January 29, 2021 | $799.00 |
| Galaxy S21+ | January 14, 2021 | January 29, 2021 | $999.00 |
| Galaxy S21 Ultra | January 14, 2021 | January 29, 2021 | $1,199.99 |
| Galaxy S21 FE | January 3, 2022 | January 11, 2022 | $699.99 |
| Galaxy S22 | February 9, 2022 | February 25, 2022 | $799.00 |
| Galaxy S22+ | February 9, 2022 | February 25, 2022 | $999.00 |
| Galaxy S22 Ultra | February 9, 2022 | February 25, 2022 | $1,199.00 |

The above list of impacted Devices is not exhaustive and will be further developed upon discovery.

26.     The scope of the GOS app presence – including whether the app was pre-installed to the device, available for voluntary download, or a forced update to the Device, and whether the app is removable or non-removable – is believed to vary based on the generation of the Samsung Device. Upon information and belief, GOS was pre-installed on some Galaxy S21 and older-model Devices, and was pre-installed and is non-removable on the recently released Galaxy S22.

B. **Samsung's Performance Representations**

27.     The market for smart phones and tablets is currently dominated by devices running on the Android operating system ("OS") developed by Google, and Samsung is one of several manufacturers that make and market devices running on the Android OS.

28.     The OS of a smart phone or tablet largely dictates the experience for the user of the device.  Consequently, because the Android OS is used by multiple device manufacturers (unlike Apple's proprietary iOS, for example), Samsung cannot simply rely on the OS as a point of differentiation to drive sales.  Instead, in order to gain and keep market share and revenue, Samsung must differentiate its Android OS devices from all the other Android OS devices in the marketplace.

29.     Samsung attempted to accomplish this through a scheme designed to mislead reviewers and the public about the speed, performance, and battery life of its Devices.

30.     Samsung is well aware that, in order to remain competitive with competitors such as Apple, its Devices must get increasingly faster and more powerful, while maintaining adequate battery life. Defendant is also well aware that benchmark testing is the means by which the speed of its Devices is measured and compared to Apple's iPhone as well as other Android smartphones.

31.     "Benchmark" apps are programs or applications for smart phones and tablets that run a set of standardized tests and trials in order to assess device performance.  By design, running the same benchmark app on different devices allows one to assess the relative performance of the different devices—the device that completes the tests and trials more quickly receives a higher score from the benchmarking app than the slower device.  Popular benchmark apps for Android OS mobile devices include Geekbench, 3DMark, PCMark, Quadrant, Antutu, CPDT, Linpack,

Androbench, and GFXBench.  When new mobile devices are released, reviewers commonly use benchmark apps to compare the devices both to their predecessor devices and to the competition.

32.     Defendant's Devices are commonly perceived as being vastly outperformed by Apple in benchmark testing. Consequently, through benchmark manipulation, and the false representations of performance derived therefrom, Samsung caused false and misleading information to proliferate.

33.     By artificially manipulating the performance of the Devices on benchmark tests, Samsung has falsely represented the performance of its phones relative to those of its competitors. Samsung has taken these actions knowing that the benchmarking manipulations would result in false information being communicated to consumers, and that this false information would influence their buying decisions.

34.     Samsung intentionally misled the public by misrepresenting the performance capability of its Devices and artificially boosting performance during benchmark testing. Samsung knew that publications and review sites regularly use benchmarking apps to review and evaluate new devices and to compare competing devices. Samsung also knew that if it artificially boosted the performance of its devices when running benchmarking apps, reviewers and the public would falsely believe that the Devices were comparatively faster than competing devices in real-world situations.  In reality, the processors run at a lower speed and the artificial performance boost disappears when the devices are performing real-world tasks instead of running benchmarking apps.

35.     Samsung made false representations directly to consumers in promising to deliver both better performance and better, longer battery life – Samsung knew it could not deliver both

to consumers, so it chose to sacrifice (without disclosing to those consumers) performance in the form of its throttling manipulation.

36.     Moreover, in manipulating the benchmark performance of the Devices, Samsung effectively made false representations to persons who ran benchmarking apps on the Devices, and it did so with the knowledge and/or intent that such false representations would be passed on to consumers and that it would influence their purchase decisions. The false statements that Samsung made through benchmark manipulations were passed on to the consumers through reviews published prior to the launch of the Devices in the United States.

37.     Notwithstanding, Samsung has not kept pace with the performance output of the iPhone. For example, according to a January 18, 2022 review published by *Tom's Guide*, a publication that provides technology product reviews and picks, and "help[s] you decide what tech to buy":

> In our benchmark testing, though, the S21 can't match the iPhone 12. For example, Apple's A14 Bionic in the iPhone 12 scored an impressive multicore score of 3,859 in Geekbench 5. The S21, meanwhile, topped out at 3,302. In our Adobe Premiere Rush test, where a 4K video is transcoded to 1080p, the Galaxy S21 completed the test in 1 minute and 3 seconds. The iPhone did the same task in a blistering 26 seconds.[4]

38.     As depicted below, Benchmark app Geekbench performed a comparison between the Samsung Galaxy S21 Ultra 5G and the iPhone 14,3. The benchmark comparison demonstrates respective Single-Core Scores of 1065 and 1738 between the Samsung Device and the iPhone, a difference of 61.3%, and respective Multi-Core Scores of 3186 and 4766, a difference of 66.8%.[5]

---

[4] https://www.tomsguide.com/news/samsung-galaxy-s21-vs-iphone-12-which-phone-wins
[5] The GeekBench scores have been split into Single and Multi-Core categories. The Single-Core score is more relevant for games and applications that are lightly threaded, meaning they rely on a single core to process many – but not all – instructions. Multi-Core scores are more relevant for



39.     Knowing that consumers seek speed, power, and battery life in selecting a smartphone, Samsung heavily targets these attributes in its marketing efforts.[6] In Samsung's Official Introduction Films for the Galaxy S22 Ultra[7], it boasts "welcome to the epic standard of smartphones." According to Samsung, the Device has "the fastest chip ever on Galaxy," "a 4nm processor, the fastest on Galaxy, with a 73% faster NPU," "fuels a long-lasting battery that can go beyond a day on a single 45W super-fast charge," and breaks the rules of what a smartphone can do."

---

games and applications that are heavily threaded, meaning they distribute their instructions between multiple cores.

[6]   As an example, per Samsung's 2021 Half-Year Financial Report (available at: https://images.samsung.com/is/content/samsung/assets/global/ir/docs/2021_Half_Year_Report.pdf), Samsung spent over $2 billion ($2,697,575 "in millions of Korean won," divided by approximate current exchange rate of $1.00 U.S. to 1,220 South Korean won) on advertising during the first six months of 2020 alone. As part of its marketing efforts, Samsung signed international music superstars "BTS" to promote its Galaxy products – BTS' video advertisements (e.g., https://www.youtube.com/watch?v=Pii224aV-jY) have generated millions of views on YouTube.

[7]   https://www.youtube.com/watch?v=2Jdpwb_0F5w; https://www.youtube.com/watch?v=VYLzOakff2g

40.     Defendant touts its Galaxy S22 and S22+[8] as having its "fastest processor ever." Per Samsung's website, Defendant claims "[w]hether you're vlogging your day, gaming all night or simply scrolling your feed, the 4nm processor makes for an incredibly smooth experience." In regard to the product's battery, Samsung states, "Galaxy S22 is powered by a 3700mAh (typical) battery, and Galaxy S22+ by a 4500mAh (typical) battery.30. Both intelligently adapt to how you use your phone to make sure that it outlasts the day — and then some.[9]"

41.     Samsung's marketing efforts surrounding the Galaxy S22 product line created much anticipation among consumers for the Devices' speed, power, and long-lasting battery. As examples:

▪ Per an article on PhoneArena.com[10], "[t]he Galaxy S22 Ultra is the latest super-phone vying for the top spot on the shelves and in your pocket. Lauded as the next best thing to come out of the Korean peninsula since kimchi, this phone acts as the spiritual successor of the Note lineup in everything but name, and as such, comes loaded with Samsung's best tech to date."

▪ Per a review of the S22 Ultra published on SlashGear.com[11], "[u]nsurprisingly, Qualcomm's newest silicon and 12GB of memory in my review handset proved to be every bit as fast as you'd hope. No lag, no slowdown. That's good, obviously, but it also feels like table-stakes at this point in the market." Further, "[t]he 5,000 mAh battery in the Galaxy

---

[8] https://www.samsung.com/us/smartphones/galaxy-s22/
[9] The statement contains a footnote which states, "Based on average battery life under typical usage conditions. Average expected performance based on typical use. Actual battery life depends on factors such as network, features selected, frequency of calls, and voice, data, and other application usage patterns."
[10] https://www.phonearena.com/reviews/Samsung-Galaxy-S22-Ultra-vs-Google-Pixel-6-Pro_id5279
[11] https://www.slashgear.com/772111/samsung-galaxy-s22-ultra-review-everything-is-not-for-everybody/

S22 Ultra is a beast. Getting through a full day is no problem at all, even with plenty of photography. For topping it up, there's 45W wired and 15W wireless support, though — beyond the USB-C cable in the box — Samsung leaves you to your own devices to supply the charger itself."

- Per a review published on DigitalTrends.com[12], "[u]nquestionably, the Samsung Galaxy S22 Ultra is the most multipurpose smartphone you can buy today, and regardless of what you want to do with your phone today, tomorrow, or in two years' time, its astonishing ability and varied feature set will have you covered. There's real value in buying a phone so capable, as although the initial outlay for the Galaxy S22 Ultra is high, there won't be any real need to replace it for the foreseeable future."

- Per a review published on Engadget.com[13], the "Galaxy S22 line is one of the first phones to feature Qualcomm's new Snapdragon 8 Gen 1 chip, which when combined with 8GB of RAM and 128GB of storage (or 256GB if you opt for the upgrade) results in a phone that feels blisteringly fast. In my experience, there isn't really anything you can throw at the S22 that makes it even sweat, aside from stuff like hardcore multitasking when connected to an external monitor via Samsung Dex (which is still very much a thing)".

42.     Articles clearly show speed and performance are important, and data from benchmarking apps are relied on by media and consumers.  For example, MacRumors recently released an online article titled, "iPhone 13 is Significantly Faster Than Samsung's New Galaxy S22 in Benchmarks."[14] The article refers to the benchmark testing conducted by PCMag, wherein

---

[12] https://www.digitaltrends.com/mobile/samsung-galaxy-s22-ultra-review/
[13] https://www.engadget.com/samsung-galaxy-s-22-review-sprucing-up-a-solid-foundation-151522033.html
[14] https://www.macrumors.com/2022/02/11/samsung-galaxy-s22-vs-iphone-13-benchmark/

"the Galaxy S22 Ultra with Qualcomm's Snapdragon 8 Gen 1 processor achieved a multi-core score of 3,433, compared to 4,647 for the iPhone 13 Pro Max with Apple's A15 Bionic chip. Based on these results, the iPhone 13 Pro Max is around 35% faster than the Galaxy S22 Ultra for CPU performance."

43.    On February 11, 2022, PCMag released an online article titled, "Galaxy S22 Benchmarked: Apple Still Beats Samsung,"[15] which states, "[w]hile the Samsung Galaxy S22 is the most powerful Android phone we've seen so far, it benchmark results fall behind Apple's iPhone 13 Pro Max." Interestingly, the article notes, "[w]hile running benchmarks, the phone quickly became warm, and as soon as it became warm it returned much lower results. A Geekbench result of 1,232 became 802 with a warm phone, and GFXBench result of 28fps became 19fps."

## C.  Samsung's GOS App Throttling

44.    Defendant installs the GOS app in its Galaxy line and other smartphone models prior to delivering the Devices to consumers ("pre-installs"). To the extent that the GOS app is not pre-installed to the Device, the app can be added to Samsung smartphones for free, via software update or through the Galaxy store[16].

45.    Upon information and belief, the GOS app identifies and evaluates the name of the app that is running and, based on the name of the application, determines whether to throttle down the app's performance. In the event that GOS identifies the app as a benchmarking app, such as 3DMark or GeekBench, it does not throttle the performance – of course, this is beneficial to Samsung in that the benchmarking apps provide an exaggerated evaluation of the Devices'

---

[15] https://www.pcmag.com/news/galaxy-s22-benchmarked-apple-still-beats-samsung
[16] https://galaxystore.samsung.com/prepost/000004017258?appId=com.samsung.android.game.gos&session_id=W_42c8ff54e9c6605545067f84dc314578

performance. On the other hand, when the consumer attempts to use a non-benchmarking app, the consumer does not receive the full expected performance.

46.     Upon information and belief, users have performed various tests to identify the scope of Defendant's throttling manipulation – simply renaming the app from a benchmark app to an app not recognized as a benchmark app results in a benchmark score of less than half of what it ran with the correct name. By way of example, on or about February 25, 2022, a YouTube user posted a video depicting how Samsung subjects everyday apps to a limited, throttled performance while benchmark apps are not subjected to throttling. In his test, the YouTube user modified the package name of the "3DMark" benchmark app to "Genshin Impact," one of the apps known to be subject to throttling, and displayed for viewers as depicted in the screenshot below that the renamed package achieved a drastically lower benchmark score and average frame rate.[17]



47.     On or about March 2, 2022, Samsung's benchmark manipulation scam was exposed when Twitter user GaryeonHan and Korean netizens published a list containing 10,000 apps

---

[17] https://www.youtube.com/watch?v=Vtt2g3B1wM8

apparently subjected to throttling by Samsung's GOS app.[18] The list of apps throttled by Defendant includes prominent apps like YouTube, SnapChat, Instagram, Netflix, Disney+, Facebook, Twitter, Amazon, Google Keep, TikTok, and Microsoft Office apps. Noticeably absent from the list are benchmarking apps, including 3DMark, GeekBench, PCMark, GFXBench, Antutu, CPDT, and Androbench. By not throttling benchmark apps, the benchmark apps are able to operate at full performance, and Defendant is able to skew user expectations for its Devices' real-world speed and battery life.

48.     As the result of Defendant's benchmark manipulation, benchmark app GeekBench now excludes several of Defendant's Devices including, but not limited to, Galaxy S20, Galaxy S20+, Galaxy S20 Ultra, Galaxy S21, Galaxy S21+, Galaxy S21 Ultra, Galaxy S22, Galaxy S22+, and Galaxy S22 Ultra. As set forth at GeekBench.com[19], "[t]he devices listed below [the aforementioned Galaxy smartphones and many other Samsung products] are excluded from the benchmark chart. These devices run Geekbench (and possibly other benchmarks) in an artificial benchmark mode. Other applications do not run in this benchmark mode, which leads to benchmark results that do not correspond to real-world performance."

49.     In response to the throttling controversy and user demand for more control and transparency for throttling, Samsung issued an "apology" of sorts on or about March 4, 2022[20]:

> Our priority is to deliver the best mobile experience for consumers. The Game Optimizing Service (GOS) has been designed to help game apps achieve a great performance while managing device temperature effectively. GOS does not manage the performance of non-gaming apps. We value the feedback we receive about our

---

[18] https://www.androidauthority.com/samsung-gos-throttling-apps-3125885/?utm_source=feedly&utm_medium=webfeeds;
https://twitter.com/GaryeonHan/status/1499009797035008002?t=MEFGfeHOz85hCHrRibINTQ&s=19; http://www.mediafire.com/file/4xj5szj0xsczjsv/GOS_app_list.xlsx/file

[19] https://browser.geekbench.com/android-benchmarks/

[20] https://www.engadget.com/samsung-performance-throttling-update-164530242.html?src=rss

products and after careful consideration, we plan to roll out a software update soon so users can control the performance while running game apps.

Upon information and belief, Samsung also issued the following announcement:

We would like to inform you about the Galaxy S22 GOS. We are continuously working to expand user options and provide optimal performance by collecting opinions from customers. The Samsung Galaxy S22 series' GOS (Game Optimizing Service) is preloaded with our app that optimizes CPU and GPU performance to prevent excessive heat during long game play. In order to meet the needs of various customers recently, we plan to implement a SW update that provides a performance priority option in the game booster lab within the game launcher app as soon as possible. We will continue to listen to consumers' opinions and do our best for customer satisfaction and consumer protection. Thank you.

50.     On or about March 9, 2022, in response to public outcry regarding the "benchmark cheating" scandal, Samsung issued the following statement[21]:

The Galaxy S22 series' GOS (Game Optimizing Service) is a built-in app that optimizes CPU and GPU performance to prevent excessive heat during long game play.  In order to meet the needs of various customers recently, we plan to implement a SW update that provides a performance priority option in the game booster lab in the game launcher app as soon as possible.

**D.  Samsung's Arbitration Agreement**

51.     Samsung asserts that the purchase and use of its Devices – including, but not limited to, Galaxy S20, Galaxy S20+, Galaxy S20 Ultra, Galaxy S21, Galaxy S21+, Galaxy S21 Ultra, Galaxy S22, Galaxy S22+, and Galaxy S22 Ultra – are subject to certain contractual terms and conditions, its "Terms and Conditions," which include an agreement to submit certain disputes to arbitration (the "Arbitration Agreement").[22]

---

[21] https://www.samsungsvc.co.kr/solution/689552

[22] Terms and Conditions (samsung.com)

52.     Samsung seeks to bind consumers to its Terms and Conditions by purportedly notifying the consumer by various methods of such contractual terms and conditions, including via (1) print on product packaging, (2) printed terms within the product packaging, (3) completion of the Device's set-up process, and (4) information contained on its website.

53.     Per the terms of the Arbitration Agreement, "[e]lectronic acceptance of the agreement, opening the product packaging, use of the product, or continued possession of the product, constitutes acceptance of this agreement, regardless of whether you are the original purchaser, user, or other recipient of the product."

54.     However, assuming the consumer is aware of the Arbitration Agreement, Samsung's Terms and Conditions provide that the individual or entity "can opt out of the agreement within 30 calendar days of the first consumer purchase (or use of application) by emailing optout@sea.samsung.com or calling 1-800-SAMSUNG (726-7864) and providing the applicable information."

55.     The Arbitration Agreement elaborates as to the permissible means provided by Samsung to the consumer to opt out of the Agreement. In pertinent part, the Arbitration Agreement provides:

> You may opt out of this Agreement by providing notice to Samsung no later than 30 calendar days from the date of the first consumer purchaser's purchase of the Product, or use of the application or software. To opt out, you must send notice by e-mail to optout@sea.samsung.com, with the subject line: "Arbitration Opt Out." You must include in the opt-out email
>
> (a) your name and address;
> (b) the date on which the Product was purchased or first use of the application or software;
> (c) the Product model name or model number; and
> (d) the IMEI or MEID or Serial Number, as applicable, if you have it (the IMEI or MEID or Serial Number can be found (i) on the Product box; (ii) on the Product information screen

20

which can be found under "Settings;" (iii) on a label on the back of the Product beneath the battery, if the battery is removable; and (iv) on the outside of the Product if the battery is not removable).

Alternatively, you may opt out by calling 1-800-SAMSUNG (726-7864) no later than 30 calendar days from the date of the first consumer purchase of the Product and providing the same information. These are the only two forms of notice that will be effective to opt out of this Agreement. Opting out of this Agreement will not affect in any way the benefits to which you would otherwise be entitled, including the benefits of the Standard Limited Warranty.

56.     Per the terms of Samsung's Arbitration Agreement, in the event that the consumer does not successfully opt out of the Arbitration Agreement:

[A]ll disputes between [the consumer] and Samsung that in any way relate to, or arise from, the standard limited warranty; or the sale, condition, or performance of the product, shall be resolved exclusively through final and binding arbitration, and not by a court or jury. Any such dispute shall not be combined or consolidated with a dispute involving any other person's or entity's product or claim. Specifically, without limitation of the foregoing, you shall not under any circumstances proceed as part of a class action. The arbitration shall be conducted before a single arbitrator, whose award may not exceed, in form or amount, the relief allowed by the applicable law.

57.     Consequently, in the event that the consumer successfully opts out of Samsung's Arbitration Agreement, or is not otherwise bound to the Arbitration Agreement, the consumer is not limited in the ability to seek legal redress in a court of competent jurisdiction or to proceed as part of a class action.

## V.      CLASS ACTION ALLEGATIONS

58.     Plaintiffs bring all claims as class claims under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure.

59.     Plaintiffs brings their claims on their own behalf, and on behalf of the following proposed classes of persons:

- All persons or entities who purchased a Samsung Device containing the GOS app and opted out of or are otherwise not subject to the purported Arbitration Agreement contained in Samsung's Terms and Conditions (the "National Class"); and

- All persons or entities who purchased a Samsung Device containing the GOS app in the State of New York and opted out of or are otherwise not subject to the purported Arbitration Agreement contained in Samsung's Terms and Conditions (the "New York Subclass");

60.     The National Class and the New York Subclass are referred to, collectively, as the "Classes."

61.     Plaintiffs reserve the right to modify or amend the definition of the proposed Classes before the Court determines whether certification is appropriate.

62.     Excluded from the Classes are: the Defendant; any of its corporate affiliates; any of its directors, officers, or employees; any persons who timely elects to be excluded from the Classes; any government entities; and any judge to whom this case is assigned and his or her immediate family, law clerks, and court staff.

63.     The claims for relief asserted herein satisfy the prerequisites for certification as a class action pursuant to Federal Rule of Civil Procedure 23(b)(3):

    a.  There are questions of law or fact common to the Classes;

    b.  The claims or defenses of the representative parties are typical of the claims or defenses of the Classes;

    c.  The representative party will fairly and adequately protect the interests of the Classes;

    d.  The questions of law or fact common to Class Members predominate over any questions affecting only individual members; and

e.  A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

64.   <u>Numerosity</u>. The Classes are so numerous that joinder of individual members thereof is impracticable.  Plaintiffs believe that there are thousands of members throughout the United States.  The precise number and identities of Class Members are unknown to Plaintiffs but are known to Samsung or can be ascertained through discovery, using records of opt-out communications, and other information kept by Samsung or its agents.

65.   <u>Commonality</u>. Common questions of law and fact exist as to all members of the Classes. The questions of law and fact common to the Classes include:

i.   Whether Samsung's advertising, marketing, product packaging and benchmark manipulations were untrue, misleading, or reasonably likely to deceive;

ii.   Whether Samsung knew its conduct and statements were false or misleading;

iii.   Whether Samsung's statements, conduct and/or omissions were material;

iv.   Whether Samsung's conduct violated applicable New York consumer protection statutes;

v.   Whether Defendant's alleged conduct constitutes the use or employment of an unconscionable commercial practice, deception, fraud, false pretense, false promise and misrepresentation within the meaning of the applicable state consumer fraud statutes;

vi.   Whether Defendant has been unjustly enriched under applicable state laws;

vii.   Whether Defendant has violated its express warranties to Plaintiffs and the Classes;

viii.   Whether Defendant has violated the implied warranty of merchantability under applicable state law;

ix.   Whether Plaintiffs and the Class Members are entitled to damages, restitution, disgorgement, equitable relief, or other relief; and

x.   The amount and nature of such relief to be awarded to Plaintiffs and the Classes, including the appropriate class-wide measure of damages for the Classes.

66.   The determination of the truth or falsity of these and other questions will resolve an issue that is central to the validity of each one of the claims (depending on the cause of action asserted) in one stroke. These and other questions will need to be answered in connection with every Class member's claim (depending on the cause of action asserted). These questions will generate common answers apt to drive the resolution of the litigation.

67.   <u>Typicality</u>. Plaintiffs' claims are typical of the claims of the absent members of the Classes (and any respective Subclasses) because they arise from the same course of conduct by Defendant and are based on the same legal theories as do the claims of all other members of each respective Class or Subclass. Moreover, Plaintiffs seek the same forms of relief for themselves as they do on behalf of absent Class Members.

68.   <u>Adequacy</u>. Plaintiffs will fairly and adequately protect the interests of the absent members of the Classes. Because their claims are typical of the Classes they seek to represent, Plaintiffs have every incentive to pursue those claims vigorously. Plaintiffs' interests are coincident with, and not antagonistic to, those of the absent members of the Classes. Moreover,

Plaintiffs are represented by counsel competent and experienced in the prosecution of class action matters and, in particular, consumer protection litigation.

69.     <u>Predominance</u>. Certification of the Classes under Rule 23(b)(3) of the Federal Rules of Civil Procedure is appropriate because the questions of law and fact common to the members of the respective Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

70.     <u>Superiority</u>. In addition, class action treatment under Rule 23(b)(3) is a superior method for the fair and efficient adjudication of this controversy. Among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense if numerous individual actions. Furthermore, although the damages suffered by members of the proposed Classes are substantial in the aggregate, the damages to any individual member of the Classes would be insufficient to justify individually controlling the prosecution of separate actions against Defendant. The benefits of proceeding on a class-wide basis, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any potential difficulties in managing this class action.

## VI.  CAUSES OF ACTION

### A.  Claims Brought on Behalf of the Nationwide Class

### COUNT I – FRAUD

71.     Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

72.     Plaintiffs bring this cause of action for themselves and on behalf of the Nationwide Class under the common law of fraud, which is materially uniform in all states. In the alternative, Plaintiffs brings this claim on behalf of the New York Subclass

73.     As described above, Defendant defrauded Plaintiffs and Class Members by knowingly and intentionally misrepresenting to them and to the public at large that its Devices had superior design, security, and quality, with "unmatched" performance.

74.      As described above, Defendant carried out its fraudulent and deceptive conduct through affirmative misrepresentations, omissions, suppressions, and concealments of material fact to Plaintiffs and the Class Members, as well as to the public at large.

75.     These representations were false, as detailed above.  Defendant knew that the representations were false and acted with knowledge of their falsity intentionally to induce Plaintiffs and Class members to buy Defendant's Devices, as well as avoid Defendant's warranty obligations, and achieve windfall profits at the expense of Plaintiffs and all Class Members.

76.     Plaintiffs and Class Members had no reasonable means of knowing that Defendant's representations were false and misleading.

77.     Defendant's actions constitute actual fraud and deceit because Defendant did the following with the intent to deceive Plaintiffs and Class Members and to induce them to enter into purchasing Defendant's Devices:

　　　　a.  Suggesting that the Devices were far superior to anything on the market with unmatched performance, security, and quality, even though it knew this to be not true; and

      b.   Positively asserting that the Devices were far superior to anything on the market with unmatched performance and quality, in a manner not warranted by the information available to Defendant.

78.    Defendant's misrepresentations were material in that they would affect a reasonable consumer's decision to purchase Defendant's Devices.  Plaintiffs and Class Members paid a premium for Samsung Devices precisely because they purportedly offered superior quality and performance than anything on the market.  Whether Defendant's Devices were defective would have been an important factor in Plaintiffs' and the Class Members' decisions to purchase or obtain Samsung Devices.

79.    Defendant's intentionally deceptive conduct induced Plaintiffs and Class Members to purchase Defendant's Devices and resulted in harm and damage to Plaintiffs and Class Members.

80.    Plaintiffs believed and relied to their detriment upon Defendant's affirmative misrepresentations.  Class members are presumed to have believed and relied upon Defendant's misrepresentations because those facts are material to a reasonable consumer's decision to purchase Samsung Devices.

81.    Defendant also fraudulently concealed and suppressed material facts regarding the Devices.  Well prior to disclosure to the public, Defendant intentionally manipulated its Devices' benchmark performance, and continued and continues to promote and tout its products as the most secure devices in the world.  It knew when it marketed and sold the Devices that the devices were not superior in quality or performance as Defendant claimed.  Defendant failed to disclose these facts to consumers at the time they marketed and sold the Devices.  Defendant knowingly and

intentionally engaged in this concealment in order to boost sales and revenues, maintain its competitive edge in the industry, and obtain windfall profits.

82.  Plaintiffs and Class Members had no reasonable means of knowing that Defendant's representations were false and misleading, or that Defendant had omitted to disclose material details relating to the Devices.  Plaintiffs and Class Members did not and could not reasonably discover Defendant's concealment on their own.

83.  Defendant had a duty to disclose, rather than conceal and suppress, the full scope and extent of the Devices' performance because:

    a.  Defendant had exclusive or far superior knowledge of its throttling manipulation through the GOS app, and concealment thereof;

    b.  The details regarding its throttling manipulation through the GOS app and concealment thereof were known and/or accessible only to Defendant;

    c.  Defendant knew Plaintiffs and Class Members did not know about Defendant's throttling manipulation through the GOS app and concealment thereof and that the untrained observer would not be able to detect the inherent defects in the Devices; and

    d.  Defendant made representations and assurances about the qualities of the Devices, including statements about the Devices' superior performance and abilities that were misleading, deceptive, and incomplete without the disclosure of the fact that it engaged in throttling manipulation through the GOS app.

84.  These omitted and concealed facts were material because a reasonable consumer would rely on them in deciding to purchase Samsung Devices, and because they substantially reduced the value of the Devices that Plaintiffs and Class Members purchased.  Whether

Defendant's Devices were defective would have been an important factor in Plaintiffs' and the Class Members' decisions to purchase or obtain the Devices.

85.     Plaintiffs and the Class Members trusted Defendant not to sell them products that were defective.

86.     Defendant intentionally and actively concealed and suppressed these material facts to falsely assure consumers that its Devices were of superior quality and performance level, as represented by Defendant and as reasonably expected by consumers.

87.     Plaintiffs and the Class Members were unaware of these omitted material facts and would have paid less for the Devices, or would not have purchased them at all, if they had known of the concealed and suppressed facts.  Plaintiffs and the Class Members did not receive the benefit of their bargain due to Defendant's fraudulent concealment.

88.     Plaintiffs and Class Members relied to their detriment upon Defendant's reputations, fraudulent misrepresentations, and material omissions in deciding to purchase the Devices.

89.     As a direct and proximate result of Defendant's deceit and fraudulent concealment, including its intentional suppression of the true facts, Plaintiffs and the Class suffered injury.  They purchased Devices of inferior quality and performance, which had a diminished value by reason of Defendant's concealment of, and failure to disclose, the defects.

90.     Plaintiffs and the Classes sustained damages as a direct and proximate result of Defendant's deceit and fraudulent concealment in an amount to be proven at trial.

91.      Defendant's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Class Members' rights, with the aim of

enriching Defendant, justifying an award of punitive damages in an amount sufficient to deter such wrongful conduct in the future.

### COUNT II – UNJUST ENRICHMENT / QUASI-CONTRACT

92.     Plaintiffs reallege and incorporates the preceding paragraphs as if fully set forth herein.

93.     Plaintiffs bring this cause of action for themselves and on behalf of the Nationwide Class under the common law of fraud, which is materially uniform in all states. In the alternative, Plaintiffs bring this claim on behalf of the New York Subclass.

94.     Plaintiffs bring this claim as an alternative to the contractual warranty claims asserted below or due to Defendant's intentional and deceptive efforts to conceal the defects in the Devices and avoid Defendant's warranty obligations.

95.     Defendant received hundreds of millions – if not billions – in revenue from the sale of the Devices.

96.     This revenue was a benefit conferred upon Samsung by Plaintiffs and the Classes.

97.     Defendant was unjustly enriched through financial benefits conferred upon it by Plaintiffs and the Classes, in the form of the amounts paid to Defendant for the Devices.

98.      Plaintiffs and the Classes elected to purchase the Devices based upon Defendant's misrepresentations, deception, and omissions.  Defendant knew and understood that it would and did receive a financial benefit, and voluntarily accepted the same, from Plaintiffs and the Classes when they elected to purchase the defective Devices.

99.     By selecting Samsung's Devices and purchasing them at a premium price, Plaintiffs and the Classes reasonably expected that the Devices would have the unmatched performance and quality promised by Samsung.

100.    Therefore, because Defendant will be unjustly enriched if it is allowed to retain the revenues obtained through falsehoods, deception, and misrepresentations, Plaintiffs and each Class Member are entitled to recover the amount by which Defendant was unjustly enriched at his or her expense.

101.    Accordingly, Plaintiffs, on behalf of themselves and each Class member, seeks damages against Defendant in the amounts by which Defendant has been unjustly enriched at Plaintiffs' and each Class Member's expense, and such other relief as this Court deems just and proper.

## COUNT III – FRAUD BY CONCEALMENT

102.    Plaintiffs reallege and incorporates the preceding paragraphs as if fully set forth herein.

103.    Plaintiffs bring this cause of action for themselves and on behalf of the Nationwide Class under the common law of fraud by concealment, which is materially uniform in all states. In the alternative, Plaintiffs bring this claim on behalf of the New York Subclass.

104.    As set forth above, Plaintiffs and the putative Class Members have suffered from a defect that existed in the Devices at the time of purchase.

105.    Samsung intentionally concealed that the Devices are defective.

106.    As alleged above, Samsung further affirmatively misrepresented to Plaintiffs and the other Class Members, in advertising and other forms of communication, including standard and uniform material provided with each Device and on its website, that the Devices they were selling had no significant defects, and that the Devices were safe, reliable, durable, and of high quality, and would perform and operate in a safe manner and with certain speed, power, performance, and battery life.

107.    Defendant knew about the defect in the Devices when these representations were made.

108.    The Devices purchased by Plaintiffs and the other Class Members were defective.

109.    Defendant had a duty to disclose that the Devices contained a fundamental defect as alleged herein, because Plaintiffs and the other Class Members relied on Defendant's material representations.

110.    As alleged herein, at all relevant times, Defendant has held out the Devices to be free from defects, including that the Devices' batteries lacked the capacity and power delivery to keep up with the demands placed upon them by Samsung's hardware and software. Defendant touted and continues to tout the speed, power, performance, and battery life of its Devices, but nonetheless failed to disclose important facts related to the defect and GOS app. This made Defendant's other disclosures about the Devices deceptive.

111.    The truth about the defective Devices was known only to Defendant; Plaintiffs and the other Class Members did not know of these facts and Defendant actively concealed these facts from Plaintiffs and the other Class Members.

112.    Plaintiffs and the other Class Members reasonably relied upon Defendant's deception. They had no way of knowing that Defendant's representations were false, misleading, or incomplete. As consumers, Plaintiffs and Class Members did not, and could not, unravel Defendant's deception on their own. Rather, Defendant intended to deceive Plaintiffs and Class Members by concealing the true facts about the presence of a defect in the Devices.

113.    Defendant's false representations and omissions were material to consumers because they concerned the performance and safety of the Devices, which played a significant role in the value of the Devices.

114.    Defendant had a duty to disclose the defect and violations with respect to the Devices, as well as the lack of a remedy, because they concerned the performance and safety of the Devices, the details of the true facts were known and/or accessible only to Defendant, because Defendant had exclusive knowledge as to such facts, and because Defendant knew these facts were not known to or reasonably discoverable by Plaintiffs or the other Class Members.

115.    Defendant also had a duty to disclose because it made general affirmative representations about the quality of the Devices, without telling consumers that the Devices had a fundamental defect that would affect the quality of the Devices.

116.    Defendant's disclosures were misleading, deceptive, and incomplete because they failed to inform consumers of the additional facts regarding the defect or GOS app. These omitted and concealed facts were material because they directly impact the quality and value of the Devices purchased by Plaintiffs and Class Members.

117.    Defendant has still not made full and adequate disclosures and continues to defraud Plaintiffs and Class Members by concealing material information regarding the defect in the Devices.

118.    Plaintiffs and Class Members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased or paid as much for the defective Devices, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and Class Members' actions were justified. Defendant was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Class Members.

119.    Because of the concealment and/or suppression of facts, Plaintiffs and Class Members sustained damage because they own Devices that are diminished in value as a result of

Defendant's concealment of the true performance, safety and quality of the Devices. Had Plaintiffs and Class Members been aware of the defect, and Defendant's disregard for the truth, Plaintiffs and Class Members would have paid less for their Devices or would not have purchased them at all.

120.    The value of Plaintiffs' and Class Members' Devices has diminished as a result of Defendant's fraudulent concealment of the defect, which has made any reasonable consumer reluctant to purchase a Device, let alone pay what otherwise would have been fair market value for the Device.

121.    Accordingly, Defendant is liable to Plaintiffs and Class Members for damages in an amount to be proven at trial.

122.    Defendant's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Class Members' rights and the representations that Defendant made to them, in order to enrich Defendant. Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT IV – BREACH OF EXPRESS WARRANTY

123.    Plaintiffs reallege and incorporates the preceding paragraphs as if fully set forth herein.

124.    Plaintiffs bring this cause of action for themselves and on behalf of the Nationwide Class under the law of warranties, which is materially uniform in all states. In the alternative, Plaintiffs bring this claim on behalf of the New York Subclass.

125.    In selling its Devices, Samsung expressly warranted in advertisements that its Devices were free from defect, reliable, and durable.

126.    These affirmations and promises were part of the basis of the bargain between the parties.

127.    Defendant breached these warranties arising from its advertisements, as described in more detail above. Without limitation, the Devices' batteries lacked the capacity and power delivery to keep up with the demands placed upon them by Samsung's hardware and software. The Devices share a common design defect in that the Devices fail to operate with the speed, power, performance, and battery life as represented by Samsung.

128.    As a direct and proximate cause of Samsung's breach of express warranties, Plaintiffs and the other Class Members have been damaged in an amount to be determined at trial.

**COUNT V – BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**

129.    Plaintiffs reallege and incorporates the preceding paragraphs as if fully set forth herein.

130.    Plaintiffs bring this cause of action for themselves and on behalf of the Nationwide Class under the law of warranties, which is materially uniform in all states. In the alternative, Plaintiffs bring this claim on behalf of the New York Subclass, under N.Y. U.C.C. § 2-314.

131.    Samsung is and was at all relevant times a merchant with respect to its Devices, including the model smartphones listed above.

132.    A warranty that the Devices were in merchantable condition was implied by law for the subject transactions. *See e.g.*, N.Y. U.C.C. § 2-314.

133.    Samsung marketed its Devices as having unmatched speed, power, performance, and battery life, that would function, at least, as reasonably expected by consumers and in accordance with industry standards. For example, in regard to the Samsung's marketing efforts surrounding the Galaxy S22 product line, Samsung created much anticipation among consumers

for the Devices' speed, power, and long-lasting battery. Such representations formed the basis of the bargain in Plaintiffs' and Class Members' decisions to purchase Samsung's Devices, including the Galaxy S22.

134. Plaintiffs and other Class Members purchased Samsung Devices from Samsung, or through Samsung's authorized agents for retail sales. At all relevant times, Samsung was the manufacturer, distributor, warrantor, and/or seller of the Devices.

135. Samsung knew or had reason to know of the specific use for which the Devices were purchased.

136. Because of the defect in the Devices, the Devices were not in merchantable condition when sold and are not fit for the ordinary purpose of such Devices.

137. Samsung knew about the defect in the Devices, allowing Samsung to cure its breach of its warranty if it chose.

138. Samsung's attempt to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here. Specifically, Samsung's warranty limitation is unenforceable because they knowingly sold a defective product without informing consumers about the defect. The time limits contained in Samsung's warranty periods were also unconscionable and inadequate to protect Plaintiffs and other Class Members. Among other things, Plaintiffs and other Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Samsung. A gross disparity in bargaining power existed between Samsung and Plaintiffs and the other Class Members, and Samsung knew of the defect at the time of sale.

139. Plaintiffs and Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of

Samsung's conduct described herein. Affording Samsung a reasonable opportunity to cure the breach of written warranties would be unnecessary and futile.

140.    Accordingly, Samsung is liable to Plaintiffs and Class Members for damages in an amount to be proven at trial.

**B.  Claims Brought on Behalf of the New York Subclass**

**COUNT VI – VIOLATIONS OF THE NEW YORK GENERAL BUSINESS LAW § 349**

141.    Plaintiffs reallege and incorporates the preceding paragraphs as if fully set forth herein.

142.    Plaintiffs bring this Count on behalf of the New York Subclass.

143.    Plaintiffs, and other members of the Subclass, are "persons" as defined by the New York General Business Law ("New York GBL"). N.Y. Gen. Bus. Law § 349(h). Samsung is a "person," "firm," "corporation," or "association" within the meaning of N.Y. Gen. Bus. Law § 349.

144.    New York's General Business Law § 349 makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 349. Samsung has engaged in unfair or deceptive acts or practices that violated the New York GBL, as described above and below, by, among other things, representing that the Devices have characteristics, uses, benefits, and qualities which they do not have; representing that the Devices are of a particular standard, quality, and grade when they are not; advertising the Devices with the intent not to sell them as advertised; and representing that the subject of a transaction involving the Devices has been supplied in accordance with a previous representation when it has not.

145.    In the course of Defendant Samsung's business, it willfully failed to disclose and actively concealed that the Devices contained the GOS app and, thus, were defective in that normal

use of the Devices would not result in the standard, quality, or grade of the Devices as it represented to consumers. Particularly in light of Defendant's advertising campaign, a reasonable American consumer would expect the Devices to perform at the level and speed and with the battery life as represented. Accordingly, Defendant engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the design, manufacturing, marketing, and sale of Devices containing the GOS app.

146.    In purchasing or leasing the Devices, Plaintiffs and the Subclass Members were deceived by Defendant's failure to disclose that normal use of the Devices could not result in the promised performance level, speed, or battery duration.

147.    Plaintiffs and the Subclass Members reasonably relied upon Defendant's false misrepresentations. They had no way of knowing that Defendant's representations were false and gravely misleading. As alleged herein, Defendant engaged in extremely sophisticated methods of deception. Plaintiffs and the Subclass Members did not, and could not, unravel Defendant's deception on their own, as Plaintiffs and the Subclass Members were not aware of the existence of the defective nature of the Devices prior to purchase.

148.    Defendant's actions as set forth above occurred in the conduct of trade or commerce.

149.    Defendant's deception, fraud, misrepresentation, concealment, suppression, or omission of material facts were likely to and did in fact deceive reasonable consumers.

150.    Defendant intentionally and knowingly misrepresented material facts regarding the Devices with intent to mislead Plaintiffs and the Subclass Members.

151.    Defendant knew or should have known that its conduct violated New York law regarding unfair or deceptive acts in trade or commerce.

152.    Defendant owed Plaintiffs and Subclass Members a duty to disclose the truth about the defective Devices because Defendant:

   a.   Possessed exclusive knowledge of the design of the Devices, including the inclusion and effects of the GOS app;

   b.   Intentionally concealed the foregoing from Plaintiffs and the Subclass Members; and/or

   c.   Made incomplete representations regarding the characteristics – including the speed, power, performance, and battery life – of the Devices, while purposefully withholding material facts from Plaintiffs and the Subclass Members that contradicted these representations.

153.    Due to its specific and superior knowledge that the Device characteristics were less than as represented, as well as the existence and purpose of the GOS app, its false representations regarding the Device characteristics, and Plaintiffs' and Subclass Members' reliance on these material representations, Samsung had a duty to disclose to Plaintiffs and Subclass Members that the Devices were defective, that the Devices did not have the expected quality and characteristics (including the represented speed, power, performance, and battery life), that the Devices glass on the could pose a safety hazard if and when caused to overheat, and that Subclass Members would be required to bear the cost of the damage to or replacement of their Devices. Having volunteered to provide information to Plaintiffs and Subclass Members, Samsung had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Devices purchased or leased by Plaintiffs and Subclass

members. Quality is a material concern to smartphone consumers. Samsung represented to Plaintiffs and Subclass Members that they were purchasing Devices that were free from defect, when in fact the Devices were defective and it was only a matter of time before the defects would manifest themselves.

154.    Defendant's conduct proximately caused injuries to Plaintiffs and the Subclass Members.

155.    Plaintiffs and the Subclass Members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of Defendant's conduct, Plaintiffs and the Subclass Members overpaid for their Devices and did not receive the benefit of their bargain, and their Devices have suffered a diminution in value. These injuries are the direct and natural consequence of Defendant's misrepresentations and omissions.

156.    Defendant's violations present a continuing risk to Plaintiffs as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest as their actions offend public policy and are immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

157.    As a direct and proximate result of Samsung's violations of the New York GBL, Plaintiffs and the Subclass Members have suffered injury-in-fact and/or actual damage.

158.    Pursuant to the New York GBL, Samsung is liable to Plaintiffs and the Subclass for damages in amounts to be proven at trial, treble damages for willful and knowing violations, punitive damages, and attorneys' fees and costs, as well as any other remedies the Court may deem appropriate under the New York GBL.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the members of the Nationwide Class and New York Subclass, respectfully request that the Court certify the proposed Nationwide Class and New York Subclass, including designating the named Plaintiffs as representatives of the Classes and appointing the undersigned as Class Counsel under the applicable provisions of Fed. R. Civ. P. 23, and that the Court enter judgment in their favor and against Defendant including the following relief:

A.      An award of declaratory relief, enjoining Defendant from continuing the unlawful, deceptive, fraudulent, harmful, and unfair business conduct and practices alleged herein;

B.      An award of restitution, compensatory damages, disgorgement, and costs for economic loss and out-of-pocket costs;

C.      An award of punitive, exemplary, and treble damages under applicable law;

D.      A determination that Defendant is financially responsible for all Class notices and the administration of class relief;

E.      An award of any applicable statutory or civil penalties;

F.      An order requiring Defendant to pay both pre-judgment and post-judgment interest on any amounts awarded;

G.      An  award  of  reasonable  counsel  fees, plus reimbursement of reasonable costs, expenses, and disbursements, including reasonable allowances for the fees of experts

H.      Leave to amend this Complaint to conform to the evidence produced in discovery and at trial; and

I.      Any such other and further relief the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of

Civil Procedure, of all issues so triable.


Dated: June 10, 2022                            Respectfully submitted,

                                              /s/ Christopher A. Seeger

                                               _____

                                               Christopher A. Seeger, Esq.
                                               David R. Buchanan, Esq.
                                               Christopher L. Ayers, Esq.
                                               Justin M. Smigelsky, Esq.
                                               **SEEGER WEISS LLP**
                                               55 Challenger Road, 6th Floor
                                               Ridgefield Park, New Jersey 07660
                                               (973) 639-9100
                                               cseeger@seegerweiss.com
                                               dbuchanan@seegerweiss.com
                                               cayers@seegerweiss.com
                                               jsmigelsky@seegerweiss.com


                                               Shauna B. Itri, Esq.
                                               **SEEGER WEISS LLP**
                                               1515 Market Street, Suite 1380
                                               Philadelphia, PA 19102
                                               (215) 564-2300
                                               sitri@seegerweiss.com